IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TIMOTHY MARK ANDERSON,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 25-CR-3053-LTS |

**SENTENCING MEMORANDUM**

**Potential Witnesses:**

1. Brian Cataldo

2. Special Agent Kevin Kohler

**Potential Exhibits:**

1. Grand Jury Transcript of J.C.

2. Grand Jury Transcript of D.D.

3. Grand Jury Transcript of C.G.

4. Grand Jury Transcript of S.J.

5. Grand Jury Transcript of T.J.

6. Grand Jury Transcript of D.L.

7. Grand Jury Transcript of E.L.

8. Grand Jury Transcript of P.P.

9. Grand Jury Transcript of F.P.

10. Grand Jury Transcript of K.R.

11. Grand Jury Transcript of B.S.

12. Grand Jury Transcript of M.S.

13. Brian Cataldo Interview

13A. Brian Cataldo Interview Attachments

14. A.D. and S.J. Interview

14A. A.D. and S.J. Interview Attachments

15. Avis Tripilas Interview

**<u>Issues:</u>**

(1) Whether a 12-level enhancement for loss applies, pursuant to USSG §2B1.1(b)(1)(G)?

(2) Whether a two-level enhancement for sophisticated means applies, pursuant to USSG §2B1.1(b)(10)(C)? <u>and</u>

(3) Restitution.

The government will respond to defendant's anticipated motion for downward variance after reviewing it.


**I. INTRODUCTION ........ 3**

**II. LEGAL AND FACTUAL BACKGROUND ........ 3**

**III. LOSS ........ 11**

**IV. SOPHISTICATED MEANS ........ 13**

**V. RESTITUTION ........ 15**

**VI. CONCLUSION ........ 16**

## I. INTRODUCTION

Defendant Timothy Mark Anderson, an attorney and avid collector of Rolls-Royce vehicles, engaged in a complex scheme to defraud the Iowa Medicaid program. Over the course of nearly five years, defendant instructed elderly individuals and their heirs to engage in a multi-layered series of sham vehicle transactions. Specifically, defendant directed families to have the elderly person, before applying for Medicaid benefits, purportedly "buy" one of his Rolls-Royce or other luxury vehicles. Later, defendant told the families to have the elderly persons "gift" the same vehicles to the heirs, who then re-"sold" the vehicles back to defendant at a lower price.

Defendant presented false and fraudulent information and documents to Iowa Medicaid and the Hancock County Treasurer in order to make it appear as if the applicants legitimately qualified for a vehicle exemption authorized pursuant to federal and state law. Defendant's sham vehicle transactions and fraudulent statements and documents made it appear, falsely, as if the applicants for Iowa Medicaid had little or no non-exempt assets to pay for their nursing home care.

In total, defendant attempted to perpetrate nearly a half-million dollars worth of health care fraud upon Iowa Medicaid. As a result of defendant's scheme, federal and state taxpayers lost over $180,000.

## II. LEGAL AND FACTUAL BACKGROUND

The government understands from defendant's stated objections to the Final Presentence Investigation Report (R. Doc. 28) ("PSR"), and the parties' sentencing

conference, that the underlying material facts of this case are not in issue. *See* PSR ¶¶ 1-120. Instead, the government understands that defendant contests the legal and factual inferences that the government and probation office have drawn from those undisputed underlying facts.

Specifically, while defendant continues to admit that he knowingly made a false statement to Iowa Medicaid about the value of a 1961 Rolls Royce Phantom V on November 4, 2021 (specifically, defendant stated the vehicle was worth $194,000 when, in truth, it had recently been totaled in a car accident, as he admitted in his plea agreement and at his guilty plea hearing), *see* PSR ¶¶ 35-40, defendant asks this Court to find that the sham vehicle transactions in question were legitimate, that he otherwise complied with the rules of Iowa Medicaid, and that there was no scheme to defraud here.[1]

Defendant's argument defies the law and common sense. At the outset, the law is clear that vehicles are *not* exempt for purposes of Medicaid eligibility unless the vehicle in question is used for the transportation of the Medicaid applicant or a member of the applicant's household. *See* 20 C.F.R. 1218(b)(1) ("One automobile is totally excluded regardless of value if it is used for transportation for the individual or a member of the individual's household."); Ex. 15, at 2 (statement of Medicaid

[1] If the government has misunderstood the extent of defendant's objections to the offense conduct portion of the PSR, then the government intends to prove all the contested material facts at the sentencing hearing through the testimony of Special Agent Kevin Kohler, Brian Cataldo, and Sentencing Exhibits 1 through 15.

official).[2] Defendant, an attorney and expert in Medicaid eligibility, certainly was aware of this regulation. Indeed, J.C., a state investigator, expressly cited the regulation to defendant twice in November 2021, while the scheme was still ongoing. Ex. 1, at 9-10.[3]

More fundamentally, the overwhelming evidence makes clear all the vehicle transactions at issue in this case were fraudulent. Intent to defraud, of course, is a circumstantial inquiry that depends upon the totality of the circumstances. *See United States v. Jewell*, 893 F.2d 193, 194 (8th Cir. 1990) ("Proof of knowledge, like proof of intent, is rarely established by direct evidence, but may be proved by all pertinent circumstances."); *In re Grand Jury Proceedings, G.S., F.S.*, 609 F.3d 909, 913-14 (8th Cir. 2010) (in determining whether to apply the crime-fraud exception, emphasizing that the conversion of assets from non-exempt to exempt in pre-bankruptcy planning "is not in itself fraudulent" but instead "the critical issue is whether the debtor had fraudulent intent," and identifying factors for courts consider, including "whether there was any conduct designed to mislead, whether the debtor made an effort to conceal the pre-bankruptcy transfers, whether the transaction involved an insider, and the amount of property converted from non-

---

[2] In his plea agreement, defendant acknowledged, but did not stipulate to, the government's position that 20 C.F.R. § 416.1218(b)(1) applies. *See* Plea Agreement R. Doc. 14-1, at 4, ¶ 9(C).

[3] J.C. testified, "Each time I mentioned that he would go back to, 'Well, they can have any kind of car they want,' and it seemed that he was ignoring it and glossed over it." Ex. 1, at 9. J.C. later added, "When you give a lawyer the number of the law you're looking at, normally they're like, 'Well, wait. Let me look at that.' That should be the normal response. That wasn't the response." Ex. 1, at 22.

exempt to exempt," as well as the "debtor's entire pattern of conduct . . . as when a debtor attempts to exempt virtually all of his assets from creditors" while seeking a discharge) (citations omitted); *In re Sholdan*, 217 F.3d 1006, 1009-10 (8th Cir. 2000) (similar).

Here, defendant's Rolls-Royce and other luxury vehicle transactions to the families were sham transactions intended to deceive Iowa Medicaid:

*First*, defendant is an avid collector of Rolls Royce and other luxury vehicles. An insurance claims adjuster, E.L., testified that defendant "was a little bit braggadocious about being the largest private owner of Rolls-Royces in the Midwest and he bought [the 1961 Rolls-Royce] from somebody in Ohio who bought it from the royal family." Ex. 7, at 12. Defendant never intended to part ways with the vehicles. *See* Ex. 6, at 9 (D.L. testified that defendant stated "he doesn't really sell much of anything. He likes to collect, so he buys. He did sell a Cadillac, though, a few years ago, maybe.") Indeed, defendant chose to rebuild the totaled 1961 Rolls Royce Phantom with original parts that one of his clients purported owned after he submitted an insurance claim for the accident. Ex. 7, at 12, 19-20. Defendant owns the Rolls-Royce vehicles to this date. PSR ¶ 155. Defendant maintained color-coordinated college-themed licensed plates on the vehicles; B.S. testified a relative paid for the plates during the title transfer process but never put them on the vehicle. Ex. 11, at 20-22.

*Second*, the purported purchasers of defendant's vehicles never drove the vehicles and, for the most part, never even saw them. *See* Ex. 2, at 12 (D.D. never

drove or saw vehicle); Ex. 3, at 14 (C.G. never saw vehicle, supposed elderly purchaser of the vehicle did not know about it, and nobody drove it); Ex. 4 (S.J. testified that her mother "asked if she could at least get a picture of herself in it and she was told it was winterized and it was covered up and she maybe would get to see it some other time"); Ex. 5 (T.J. never had possession of the vehicle, never drove it, and never saw it); Ex. 6, at 13-14 (D.L. testified he had neither seen nor driven the vehicle and had no use for it); Ex. 8, at 5 (P.P. testified he did not even know his name was on one of the vehicles); Ex. 9, at 9 (F.P. testified his elderly father never saw the vehicle, and the vehicle remained in defendant's possession the entire time); Ex. 10, at 15 (K.R. testified she sat in the driver's seat but no member of the family ever drove it or had the keys); Ex. 10, at 17-19 (K.R. did not know she owned the vehicle or that it was in her name); and Ex. 11, at 21 (B.S. never drove the vehicle or had the keys).

*Third*, these vehicle title transfers were not arms-length transactions. To the contrary, defendant himself identified the vehicle and selected its price based solely on the amount of otherwise non-exempt moneys he was attempting to shield from Iowa Medicaid, which was always the maximum. *See*, *e.g.*, Ex. 1, at 27 (J.C. testified, "What I found very, very interesting with his determination of equity value is it was exactly the amount of money that needed to not be countable at that particular moment rather than the value of the car"); Ex. 2, at 11, 15 (admitting

process was a “sham”);[4] Ex. 11, at 13, 26 (B.S. testified that defendant told his mother what the purchase price would be, and that price was based on her assets; B.S. admitted the sale was a “legal fiction”); Ex. 9, at 11 (similar, F.P. testimony). On one occasion, defendant later increased the purchase of a vehicle by $6,000 after he discovered that he had initially miscalculated and undercounted the applicant’s non-exempt assets. Ex. 11, at 15-16. Defendant also sold the same vehicle, the Phantom, at wildly different prices within a relatively short period of time. *See* Ex. 12, at 23-34 (explaining that defendant purported to sell the 1961 Rolls-Royce to E.J. in August 2021 for approximately $99,000 but then, in October 2021, purported to sell the same vehicle to A.D. for $186,000).

*Fourth*, defendant created and instructed others to submit and file false and fraudulent documents. For example, defendant instructed B.S. to sign a letter that defendant had drafted for B.S.’s signature, in which B.S. falsely assured Iowa Medicaid that

> The 2001 Rolls-Royce is my mother’s only vehicle and will be used by her at any time she needs to travel for any purpose including but not limited to medical appointments, travel to see my father in the care center, and for all of her other transportation needs.

Ex. 11, at 25. Defendant also submitted false certifications regarding an odometer reading and whether the 1961 Rolls-Royce had sustained damage for which the cost

[4] D.D. elaborated, “When I first heard about it, I thought it was the stupidest thing I ever heard of in my life and then three or four months later I actually participated and did it. I have no excuse. It was foolish.” Ex. 2, at 18.

of repair exceeded 50% of the fair market value before it became damaged. Ex. 7, at 24; PSR ¶ 34.

*Fifth*, defendant concealed material information about the vehicle transfers from others, including fees and costs. *See* Ex. 3, at 13 (C.G. testified that "all of a sudden he comes up with this idea and, like I said, I didn't understand why"); Ex. 4, at 22 (S.J. never found an itemized bill in her mother's papers); Ex. 5, at 4, 12-13 (T.J., who thought defendant was his lawyer, never saw a bill and was "puzzled" why defendant purchased the same vehicle for $10,000 less than what his mother had paid defendant for it); Ex. 6, at 15-16 (D.L. testified that he received a bill for "only a few hundred dollars" but, when he asked why defendant re-purchased the vehicle for less than he had just sold it to the family, defendant stated, "Well, that's way less than what I normally would charge somebody."); Ex. 7, at 19-20 (defendant concealed sham sale from insurance company during the claims process); Ex. 10, at 18-22 (K.R. testified she did not remember receiving a bill, did not know she owned the vehicle, and did not notice that defendant had repurchased the vehicle for $6,000 less than he had sold it).[5] B.S. testified he received a bill for $3,500 and characterized the difference between the price defendant sold the family the vehicle and the lower price at which he repurchased it as, "I guess the cost of doing business." Ex. 11, at 27.

[5] K.R., who was her mother's power of attorney, also testified that defendant insisted on removing K.R. from her mother's bank account and obtained complete access to those accounts himself. Ex. 10, at 25-28.

*Sixth*, defendant tried to defraud Iowa Medicaid in other ways, which evidences his intent with respect to the sham vehicle transactions. For example, in another attempt to shield family assets, defendant convinced a local funeral home director to provide defendant a phony estimate for a purported $80,000 funeral for D.D. *See* Ex. 13; Ex. 13A; Ex. 14; Ex. 14A; *see also* Ex. 2, at 21-25.

To conclude, this was a fraudulent scheme. Defendant did *not* just make a false statement on one occasion. Defendant devised and executed a scheme to defraud Iowa Medicaid through, among other things, his sham vehicle transfers. *See Sholdan*, 217 F.3d at 1011 (in the context of the homestead exemption in a bankruptcy case, observing, "It is one thing to convert non-exempt assets into exempt property for the express purpose of holding it as a homestead and thereby putting the property beyond the reach of creditors. However, it is quite another thing to acquire title to a house for no other reason than to defraud creditors. While the homestead right is a valuable one . . . it was never intended, and it should never be permitted, to operate as a vehicle for fraud and rank injustice.' " (cleaned up)); *In re Johnson*, 880 F.2d 78, 82 (8th Cir. 1989) (in bankruptcy context, indicia of fraud beyond mere use of an exemption includes extrinsic evidence such as "further conduct intentionally designed to materially mislead or deceive creditors about the debtor's position; conveyances for less than fair value; or, the continued retention, benefit or use of property allegedly conveyed together with evidence that the conveyance was for inadequate consideration" and, "where an exemption . . . is not

limited in amount, the amount of property converted into exempt forms and the form taken may be considered in determining whether fraudulent intent exists").

Accordingly, the Court should find that defendant's vehicle transfers were sham transactions and part-and-parcel of defendant's scheme to defraud Iowa Medicaid.

## III. LOSS

Section 2B1.1(b)(1)(G) of the Sentencing Guidelines instructs the Court to apply a 12-level increase to defendant's base offense level if defendant is responsible for more than $250,000 but less than $550,000 in loss. The probation office correctly assesses defendant with a 12-level increase for loss, because defendant is responsible for $497,950 in intended loss. Defendant objects to this loss calculation.[6]

The Guidelines state that "[l]oss is the greater of actual loss or intended loss." USSG §2B1.1, Note to Table (A). "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.*, Note to Table (C)(i). "Intended loss" is "the pecuniary harm that the defendant purposely sought to inflict." *Id.*, Note to Table (C)(ii). Because the term "[o]ffense" includes all relevant conduct under USSG §1B1.3, and the Court's loss calculation extends not just to defendant's

[6] In his objections, defendant asserts there was $14,700 in loss, and so only a two-level increase should apply. PSR ¶ 123, Obj. No. 30. However, in his plea agreement, defendant admitted he was responsible for at least $15,000 in loss, and thus stipulated that at least a 4-level increase applies. R. Doc. 14-1, at 6, ¶ 12(B). Defendant acknowledged in his plea agreement that the government would seek a higher loss amount at the sentencing hearing. *Id.*

false statement but also to any associated scheme to defraud of which the false statement was a part, either in furtherance of or for purposes of concealment. *See* USSG §1B1.1, cmt. (n.1(H)); *United States v. Cortez*, 557 F. App'x 596, 602 (8th Cir. 2014) (unpub. per curiam) (collecting cases). The government bears the burden to prove loss by a preponderance of the evidence. *United States v. Sample*, 213 F.3d 1029, 1034 (8th Cir. 2000) (citation omitted).

Here, the probation office correctly concluded that defendant is responsible for $497,950 in intended loss. For the reasons set forth in Part II above, the vehicle transactions were shams that were designed to conceal applicants' non-exempt moneys as exempt under Iowa Medicaid's vehicle exemption. The probation office's loss amount of $497,950 represents the sum total of the vehicle exemptions that defendant claimed for Iowa Medicaid applicants. Specifically:

$186,000 exemption for the D. Family (PSR ¶¶ 31);

$59,020 exemption for the Pi. Family (PSR ¶ 68);

$99,050 exemption for the J. Family (PSR ¶ 78);

$14,700 exemption for the G. Family (PSR ¶ 86);

$32,680 exemption for the L. Family (PSR ¶ 93);

$67,500 exemption for the Pe. Family (PSR ¶ 101); <u>and</u>

$39,000 exemption for the S. Family (PSR ¶ 114).

Accordingly, because the foregoing fraudulent vehicle exemptions constitute the harm that defendant purposely sought to inflict upon Iowa Medicaid by means

of his sham vehicle transaction scheme, the Court should overrule defendant's objection to the 12-level increase for loss under USSG §2B1.1(b)(1)(G).

## IV. SOPHISTICATED MEANS

The Guidelines provide for a two-level enhancement if the defendant's offense involves "sophisticated means." *See* USSG §2B1.1(b)(10)(C). The government objects to the USPO's failure to apply this enhancement in Paragraph 123 of the PSR.

"The sentencing guidelines instruct courts to increase a defendant's offense level by two levels if the offense 'involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.'" *United States v. Garbacz*, 33 F.4th 459, 474 (8th Cir. 2022) (quoting USSG §2B1.1(b)(10)(C)). The commentary to §2B1.1(b)(10(C) states:

> For purposes of subsection (b)(10)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

USSG §2B1.1, comment. (n.9(B)).

The two examples identified in the commentary are "'simply illustrative, not exclusive.'" *United States v. Jones*, 778 F.3d 1056, 1058 (8th Cir. 2015) (quoting *United States v. Lewis*, 93 F.3d 1075, 1082 (2d. Cir. 1996)). The Eighth Circuit has made clear that "[r]epetitive and coordinated conduct, though no one step is

particularly complicated, can be a sophisticated scheme . . . ." *United States v. Finck*, 407 F.3d 908, 915 (8th Cir. 2005). At bottom, "[a]n offense involve[s] sophisticated means if, 'viewed as a whole,' the offense conduct is 'notably more intricate than that of the garden-variety offense.'" *Garbacz*, 33 F.4th at 474 (quoting *Belfrey*, 928 F.3d at 753).

The Court should apply the sophisticated means enhancement in this case. Defendant's scheme was notably more intricate than the garden-variety false statement offense.

First, this was not a one-time offense but transpired over the course of nearly five years, from at least June 2017 through February 2022. Second, the underlying scheme involved a series of sham vehicle transactions, much akin to the creation of corporate shells, in an attempt to falsely claim exemptions for Iowa Medicaid applicants. Third, the sham vehicle transaction scheme was itself varied and multi-layered; typically, defendant instructed an elderly person to "purchase" an expensive vehicle from his collection, "gift" the vehicle to one or more adult children, and then have those adult children re-"sell" the vehicle back to defendant after Iowa Medicaid approved an exemption. Fourth, defendant prepared a series of false and fraudulent documents to execute and conceal the scheme, including on vehicle titles and to Iowa Medicaid itself.[7] Finally, on one occasion, defendant arranged for the purchase of an out-of-state vehicle to effectuate the scheme. Ex. 10, at 11-15.

[7] In declining to apply the sophisticated means enhancement, the USPO incorrectly states that defendant did not attempt to conceal the offense. PSR ¶ 123, Response to Obj. No. 31. For example, as indicated in Part II above, defendant

In sum, defendant's offense is notably more intricate than the garden-variety false statement offense, and thus the sophisticated means enhancement should apply. *Garbacz*, 33 F.4th at 474.

## V. RESTITUTION

The USPO recommends the Court order defendant to pay $184,274.36 in restitution to Iowa Medicaid. PSR ¶ 197. This consists of the following actual losses to Iowa Medicaid:

$30,394.36 on account of the exemption for E.J. (PSR ¶ 197);

$14,700 on account of the exemption for A.G. (PSR ¶ 86);

$32,680 on account of the exemption for S.L. (PSR ¶ 93);

$67,500 on account of the exemption for A.P. (PSR ¶ 101); and

$39,000 on account of the exemption for L.S. (PSR ¶ 114).

PSR ¶ 197.

In his plea agreement, defendant agreed to pay restitution for the full amount of the victims' losses to all victims of any offense not charged as a result of this plea agreement, including health care fraud and money laundering, but only if the district court finds such victims and losses at the sentencing hearing. Plea Agreement (R. Doc. 14-1), at 9-10, ¶ 18. For the reasons set forth in Parts II and III

---

wrote a letter to Iowa Medicaid for B.S.'s signature, in which B.S. falsely stated that the vehicle in question would be used for transportation. Ex. 11, at 25. In any event, the Eighth Circuit has stated proof of sophisticated concealment is not necessary for application of the sophisticated means enhancement. *United States v. Finck*, 407 F.3d 908, 915 (8th Cir. 2005).

above, the Court should find that the losses set forth above were incurred by Iowa Medicaid as a result of defendant's scheme to defraud Iowa Medicaid.

## VI. CONCLUSION

**For Count 1**, defendant's Guidelines range should be calculated as follows under USSG §2B1.1:

**Base Offense Level of 6**, pursuant to USSG §2B1.1(a)(2);

**12-level increase** for more than $250,000 but less than $550,000 in loss, pursuant to USSG §2B1.1(b)(1)(G);

**2-level increase** for sophisticated means, pursuant to USSG §2B1.1(b)(10)(C);

**2-level increase** for abuse of a trust and use of a special skill, pursuant to USSG §3B1.3;

**3-level decrease** for acceptance of responsibility, pursuant to USSG §3E1.1 (assuming defendant does not frivolously contest any material facts at the sentencing hearing); and

**2-level decrease** for zero-point offender status, pursuant to USSG §4C1.1(a) and (b)

**Total Offense Level 17**

**Criminal History Category I**

**Guidelines Range for Count 1: 24 to 30 months of imprisonment**

For reasons the government will explain in more detail at the sentencing hearing, defendant should receive a sentence within his advisory guidelines range, after consideration of the factors at 18 U.S.C. § 3553(a).

Respectfully submitted,

LEIF OLSON
United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2026, I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to the parties or attorneys of record.

UNITED STATES ATTORNEY

BY: */s/ TLV*

By: */s/ Timothy L. Vavricek*

TIMOTHY L. VAVRICEK
Assistant United States Attorney
111 7th Avenue SE, Box 1
Cedar Rapids, IA 52401
(319) 363-6333
(319) 363-1990 – fax
Tim.Vavricek@usdoj.gov